55 N.Y.2d 162 (1982)
Country-Wide Insurance Company, Appellant,
v.
Nieves Rodriguez, an Infant by Rosa Rodriguez, Her Mother and Natural Guardian, et al., Respondents.
Court of Appeals of the State of New York.
Argued January 5, 1982.
Decided February 18, 1982.
Bernard Samuels and Eric M. Alderman for appellant.
Seymour Berkowitz and Richard Godosky for respondents.
Chief Judge COOKE and Judges GABRIELLI and WACHTLER concur with Judge FUCHSBERG; Judge MEYER dissents and votes to reverse in a separate opinion in which Judge JASEN concurs; Judge JONES taking no part.
*164 FUCHSBERG, J.
This appeal calls upon us to construe subdivision 5 of section 672 of our Insurance Law, which mandates that the compulsory liability coverage required of the owner of every New York automobile include "insurance coverage *165 for such motor vehicle at least in the minimum amount required for such vehicle by the laws of [any] other state or Canadian province" when the vehicle is "used or operated" in such foreign jurisdiction; in substance, Insurance Department regulations have implemented this provision by reading it into every owner's policy (11 NYCRR 60.1 [e]). In applying subdivision 5 to the present case, of necessity we also must examine the pertinent laws of North Carolina, the State in which the events which led to this controversy arose.
The plaintiff, Country-Wide Insurance Company, is the liability carrier under a policy issued to defendant Louis Padilla on a passenger car registered to him in New York. The liability limits, broadly stated, are $10,000 for injuries to any one person and $20,000 for all persons injured in a single accident, the minima required by subdivision 2-a of section 167 of the Insurance Law. While the policy was in force, Padilla was driving his automobile in North Carolina when he was involved in a collision in which one of his passengers, Nieves Rodriguez, an infant, was injured. There followed a suit in Supreme Court, Bronx County, by young Rodriguez and her mother against Padilla and, as called for by the policy, defended by Country-Wide. It eventuated in the entry of a $100,000 judgment for the child.
In the present action, Country-Wide, joining the child, the mother and Padilla as defendants, seeks a declaration that the limit of its obligation is to pay $10,000 towards the satisfaction of the judgment and not $15,000, the minimum insurance limit generally provided for injury to one person under North Carolina's compulsory statutory scheme (see NC Gen Stats, §§ 20-309, 20-279.1, subd [11]). By way of alternative relief, Country-Wide asks that, in the event of an unfavorable determination, Padilla indemnify it for the $5,000 differential.
On cross motions for summary judgment, Special Term granted defendants Rodriguez' motion, dismissed Country-Wide's complaint, inclusive of its quest for indemnity, and declared that the policy afforded the $15,000 coverage (103 Misc 2d 906). The Appellate Division, one Justice dissenting, has since affirmed, essentially on the simple proposition *166 that our statute "has chosen to adopt the North Carolina minimum" (80 AD2d 130, 133).
On Country-Wide's further appeal, taken pursuant to CPLR 5601 (subd [a], par [i]), it presses its arguments, inter alia, that North Carolina exempts nonresident vehicles, i.e., those not registered in North Carolina, from its compulsory insurance requirements;[1] that subdivision 5 of section 672 is concerned with financial security and not liability coverage; that, since the passengers and their host were all New York residents, whose relationships and expectations were determined in New York, and since their presence in North Carolina as they were passing through that State at the time of the accident was fortuitous, the need to apply subdivision 5 of section 672 was obviated; that, in any event, since there was no proof that any sanctions, whether by way of the imposition of security or suspension of driving privileges or otherwise, were ever levied on Padilla by North Carolina as a consequence of the accident, that State's minimum limits, assuming they were within the scope of subdivision 5 of section 672, never came into play; and that, though its assured, under the policy's surety clause, would have to reimburse Country-Wide for any obligation it might undertake by using its New York minimum policy as proof of nonresidential financial responsibility, its obligation to make it available in the first instance constituted compliance with North Carolina law. For the reasons which follow, we nevertheless conclude that the result reached by the Appellate Division should be upheld.
Our analysis first focuses on subdivision 5 of section 672 of the Insurance Law, which was part of the complex of statutes which came into existence with the enactment of the New York "No-Fault Law" (L 1973, ch 13, § 1). These statutes, as did others of the same ilk which have proliferated in almost every State since the 1960's, reflected a felt need to provide a more adequate and efficient system of *167 financial responsibility for compensating victims of automobile accidents (see Montgomery v Daniels, 38 N.Y.2d 41, 50). It therefore would be unthinkable to assume that our legislators were not conscious of and concerned with the hazards the owners and other occupants of New York automobiles would face when they ventured into States (or Canadian provinces) whose laws specified different, and perhaps higher, minimum liability levels (see, generally, Conrad, Morgan, Pratt, Jr., Voltz and Bombaugh, Automobile Accident Costs and Payments [Univ of Mich Press]).
Turning to the North Carolina statutes, we immediately observe that, as a prerequisite for registration of a motor vehicle, an owner must certify to financial responsibility (NC Gen Stats, "Vehicle Financial Responsibility Act of 1957", § 20-309, subd [a]). Such certification requires proof either of a liability insurance policy or a qualitatively equivalent security deposit or self-insured status, each designed to meet the quantitative minimum liability limits of $15,000/$30,000 (NC Gen Stats, § 20-309, subd [b]; § 20-279.1, subd [11]).
True, New Yorkers driving through North Carolina do not have to meet the State's registration requirements (see n 1, supra). But this is the beginning and not the end of possible penalties, sanctions and forfeitures to which other provisions of the North Carolina statutes expose them. For, in the event of an accident, a series of alternatives which can be most onerous for the nonresident owner or operator are set in motion. In such circumstances, article 9A of the Motor Vehicle Law of North Carolina, entitled "The Motor Vehicle Safety and Financial Responsibility Act of 1953", mandates that the operating privileges of the nonresident owner or operator involved be suspended (NC Gen Stats, § 20-279.5, subd [b]; see, generally, Faizan v Grain Dealers Mut. Ins. Co., 254 NC 47). Unless the Commissioner of Motor Vehicles receives satisfactory evidence within 20 days after receipt of an accident report that a formal release, settlement or adjudication of nonliability has been obtained (no doubt a rare accomplishment in so short a time span), avoidance of suspension hinges on the ability of a driver to deposit such sum, up to $15,000 for one person's injury or death or $30,000 for any one accident, as the *168 commissioner finds sufficient to secure payment of judgments for any damages (see NC Gen Stats, § 20-279.5, subd [a]; and § 20-279.9).
Most significantly, possession of a liability policy circumvents all this license suspending and security posting, only "provided, however, every such policy or bond is subject, if the accident has resulted in bodily injury or death, to a limit, exclusive of interest and cost, of not less than fifteen thousand dollars ($15,000) because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, to a limit of not less than thirty thousand dollars ($30,000) because of bodily injury to or death of two or more persons in any one accident" (NC Gen Stats, § 20-279.5, subd [c] [emphasis added]), such coverage, of course, being, to track our subdivision 5 of section 672, "the minimum amount required for such vehicle by the laws of [North Carolina]". (See, also, NC Gen Stats, § 20-279.20, subd [a], par [2], which mandates that the nonresident's certificate of financial responsibility provided by a carrier state that the policy "shall be deemed to conform with the laws of this State relating to the terms of motor vehicle liability policies issued herein".)
As a practical matter then, the "exemption" of nonresident vehicles by North Carolina, while technically possible, is hardly short of illusory. For, the net result is that, although North Carolina, strictly speaking, does not require nonresidents to carry insurance in the limits prescribed by it ab initio, in the end the nature of its over-all plan is such that any State concerned with shielding its motorists, as New York obviously was when it adopted subdivision 5 of section 672, could hardly have failed to insist on the ultimate security of the North Carolina insurance limits within the out-of-State protection it mandated. It therefore would be unrealistic in the extreme to suppose, as the appellant here would have us do, that our Legislature intended instead to subject the hundreds of thousands of its motor vehicle owners who drive across State lines each year to the other burdens.
Also, in light of the overriding purpose of subdivision 5 of section 672, whether the potential liabilities of the appellant stem from the financial security or compulsory insurance *169 sections of North Carolina law or from a combination of both, is, at best, a consideration of form rather than substance. And, as to the appellant's surety clause contention, it seems especially inconsistent with the language of subdivision 5 of section 672 to suggest that our Legislature ever intended to impose ultimate personal liability on New York drivers for the differential between our minimum limits and those of foreign jurisdictions, be it $5,000 or even more.[2]
Nor are we moved to any different determination in this case because, for unexplained reasons, be they intentional or inadvertent in character, the North Carolina Commissioner of Motor Vehicles here did not exercise the right to suspend or fix the amount of security. The obvious answer to this contention is that the risks contemplated by subdivision 5 of section 672 were those envisioned in prospect, not in retrospect.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
MEYER, J. (dissenting).
Because the majority's holding misconstrues both the New York and the North Carolina statutes, I respectfully dissent.
Subdivision 5 of section 672 of the Insurance Law requires that "Every owner's policy of liability insurance issued in satisfaction of articles six or eight of the vehicle and traffic law shall also provide, when a motor vehicle covered by such policy is used or operated in any other state or in any Canadian province, insurance coverage for such motor vehicle at least in the minimum amount required for such vehicle by the laws of such other state or Canadian province." In total disregard of the words "for such * * * vehicle" in that subdivision the Appellate Division majority stated that "North Carolina at the time of this accident required residents and nonresidents to be insured for an amount not less than $15,000" (80 AD2d 130, 131; *170 italics supplied) and concluded that North Carolina's law "imposes a requirement on the nonresident of conforming to the minimum amount of insurance coverage mandated by the laws of North Carolina" (80 AD2d 130, 134; italics supplied). Not only was that an incorrect application of the New York law but also it misinterprets the North Carolina statutes. The majority in this court, recognizing in part the Appellate Division's error, admits that (p 168) "North Carolina, strictly speaking, does not require nonresidents to carry insurance in the limits prescribed by it ab initio," but concludes that "the nature of [the] over-all plan is such that * * * New York * * * could hardly have failed to insist on the ultimate security of the North Carolina insurance limits". Thus, though correctly conceiving what the North Carolina statute does, the majority nevertheless sustains the Appellate Division's result, ignoring not only the phrase "for the vehicle" in our statute, but the word "required" (which relates not to what New York might have required but what North Carolina law required) in that statute as well.
The simple facts are that our statute does not say "in the minimum amount that would be required for such vehicle if it were registered in such other state," and that North Carolina has not one but two financial responsibility acts, one (the 1957 act) relating to registration of vehicles and requiring a liability policy with a minimum of $15,000 (NC Gen Stats, § 20-309), and the other (the 1953 act) relating to the license of the operator or owner of a motor vehicle involved in "a motor vehicle accident within this State which has resulted in bodily injury or death or damage to the property of any one person in excess of two hundred dollars", but which does not require the filing of security or other proof of financial responsibility until after such an accident (NC Gen Stats, § 20-279.5).[*]
As the majority's footnote 1 acknowledges, a passenger vehicle registered in New York is not required to be registered in North Carolina (NC Gen Stats, §§ 20-4.8, 20-51, subd [1]), unless its owner takes up permanent or *171 temporary residence in that State extending beyond 30 days (NC Gen Stats, § 20-4.6; see § 20-313). The Padilla vehicle was, however, simply in transit through North Carolina on the way to Florida. Therefore, the $15,000 minimum provided for in the 1957 statute was not "required for such [Padilla's] vehicle by the laws of" North Carolina within the meaning of subdivision 5 of section 672 of the Insurance Law.
The 1953 statute, on the other hand, while it does not require insurance coverage for any vehicle, does provide for the suspension of a nonresident's privilege of operating a motor vehicle in North Carolina. Suspension can only occur, however, after the nonresident operator has had an accident and has failed to present to the commissioner evidence of a release from liability, a final adjudication of nonliability, or a written agreement for the payment of an agreed amount, or to deposit the amount of security the commissioner deems sufficient to satisfy any and all judgments for damages resulting from the accident (NC Gen Stats, § 20-279.5, subds [a], [b]; see, also, §§ 20-21, 20-22). The suspension provisions of the 1953 act do not apply, however, under the conditions stated in subdivision (c) of section 20-279.5 and section 20-279.6. One such condition is the existence of a liability policy or bond covering the vehicle or its owner or operator "to a limit, exclusive of interest and cost [sic], of no less than fifteen thousand dollars" (NC Gen Stats, § 20-279.5, subd [c]). Clearly, therefore, the 1953 act does not, either before or after an accident, require that a nonresident operator driving a vehicle registered in his State of residence, who has not resided in North Carolina for more than 30 days, be insured in any amount. All that it does is excuse such a nonresident driver from the suspension after an accident of his nonresident's privilege of operating a vehicle in North Carolina on a number of bases, one of which is that at the time of the accident he had insurance with a $15,000 minimum. To be noted, furthermore, is the fact that suspension is in any event not immediate or automatic; section 20-279.5 does not authorize suspension until the expiration of 20 days after receipt of a report of the accident or permit a notice of suspension to become effective until not less than 10 days after it is sent to the operator or owner.
*172 That the interpretation of the two acts above set forth is that accorded them by the North Carolina Supreme Court is made clear beyond dispute by Faizan v Grain Dealers Mut. Ins. Co. (254 NC 47), cited by the majority. The opinion in that case describes the two acts as follows (254 NC 47, 52-54):
"(a). The 1953 Act.
"This Act applies to those persons whose driver's licenses have been suspended by reason of violations of motor vehicle statutes, failure to pay and discharge judgments for damages resulting from ownership or operation of motor vehicles, or failure to prove financial responsibility where damages have been occasioned by the ownership or operation of motor vehicles. It is provided that such persons, where they are otherwise entitled to restoration of driver's licenses, must prove financial responsibility before such licenses may be restored. The financial responsibility must then be maintained for two years. One method of proving and maintaining financial responsibility is to obtain automobile liability insurance as defined by, and in compliance with, G.S. 20-279.21.
* * *
"(b). The 1957 Act.
"This Act requires proof of financial responsibility by all motor vehicle owners who apply to the Department for North Carolina registration certificates and plates. Financial responsibility may be shown by procurement of automobile liability insurance. Before a motor vehicle may be registered and registration plates obtained, a certificate of insurance coverage (FS-1) must be delivered by an insurer to the Commissioner.
* * *
"The 1953 Act applies to a limited class of motorists  those whose driver's licenses have been suspended. These motorists must show financial responsibility as a condition precedent to restoration of their driver's licenses. The 1957 Act applies to an unlimited class  all motor vehicle owners. Before obtaining periodic registration certificates and plates for vehicles, they must prove financial responsibility. One Act relates to restoration of driver's license, the other to motor vehicle registration."
*173 Not only is the majority's conclusion inconsistent with the statutes in both States, but also its policy rationale is difficult to understand. North Carolina can, if it sees fit to do so, impose upon the owners or drivers of vehicles registered in other States the obligation of carrying insurance in a stated and reasonable amount as a condition of the use of its highways in order to protect its residents (and itself if they be impecunious) against the expenses and other results of an accident within its borders (see Hess v Pawloski, 274 US 352; Leighton v Roper, 300 N.Y. 434). It has not done so. New York's interests in providing coverage under a policy issued in New York for an accident occurring in another State are (1) to protect the New York owner or New York operator from the criminal responsibility that may result from driving the vehicle in the other State without coverage in the amount required by the laws of that State and (2) as a matter of reciprocity, to protect the State where the accident occurred and the persons injured in that State against expenses and damages resulting from the injury to the same extent that the laws of that State require. A possible secondary purpose may be through the operation of reciprocity to obtain for New York residents injured by an out-of-State vehicle operated in New York the higher limit of coverage required by the other State, although that hardly seems probable because it would be most unusual for a policy issued in a higher limit State to provide that if the vehicle is operated in a lower limit State the coverage of the policy as to an accident there occurring would be reduced to the lower limit. In any event, none of those purposes has any bearing on the facts of this case, at least until an order of suspension of Padilla's nonresident operating privilege has been issued by North Carolina, for until that time Padilla is not required by North Carolina law to have any insurance and cannot be subjected to any criminal responsibility. Neither New York nor North Carolina requires $15,000 coverage for a New York registered vehicle when operated in North Carolina for less than 30 days. Nor is it reasonable to interpret New York's law, which requires only $10,000 coverage for the protection of a New York resident injured in a New York registered vehicle in an accident occurring in New York, as intended *174 to require $15,000 coverage for a New York resident's injuries, simply because the injury to the New York resident in a New York registered vehicle occurred in a State which requires of its own registered vehicle owners but not of out-of-State vehicle owners, coverage of $15,000.
I would reverse and direct the entry of judgment declaring that the limit of Country-Wide's obligation under the Padilla policy to Nieves Rodriguez is $10,000.
Order affirmed.
NOTES
[1] This point is based at least in part on the reciprocity inherent in the interplay of section 20-4.8 of the North Carolina General Statutes and subdivision 1 of section 250 of the New York Vehicle and Traffic Law. The North Carolina statute exempts from its registration requirements vehicles properly registered in another jurisdiction so long as the foreign jurisdiction grants like exemptions to vehicles registered in North Carolina. The New York statute does so provide.
[2] As to the dissenter's hypothetical query as to whether subdivision 5 of section 672 would reduce the coverage to a limit below that fixed by subdivision 2-a of section 167 of the Insurance Law when a New York automobile enters a State with lower limits, suffice it to say that subdivision 5 of section 672 does not so provide. Rather, since it specifies that the coverage shall be "at least in the minimum amount required [by the] other state", the New York limits in any event would remain applicable.
[*] Thus, the 1957 act describes the 1953 act as "relating to proof of financial responsibility required of each operator and each owner of a motor vehicle involved in an accident, and relating to nonpayment of a judgment" (NC Gen Stats, § 20-314 [italics supplied]).